No. 25-10567

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

LEIGH HOLLAND,
Plaintiff-Appellant

V.

TEXAS CHRISTIAN UNIVERSITY,
Defendant-Appellee

---

On Appeal from the United States District Court for the
Northern District of Texas-Fort Worth Division
Cause No. 4:24-cv-00289-O

---

BRIEF OF APPELLANT

---

W. D. MASTERSON
State Bar No. 13184000
KILGORE & KILGORE, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 – Telephone
(214) 953-0133 – Facsimile
wdm@kilgorelaw.com

**ATTORNEYS FOR PLAINTIFF-
APPELLANT,
LEIGH HOLLAND**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Plaintiff-Appellant hereby certifies that the following list of persons have an interest in the outcome of this case. These representations are made in order that the Justices of this Court may evaluate possible disqualification or other recusal:

Plaintiff-Appellant:                       Leigh Holland

Counsel for Plaintiff-Appellant:     W. D. Masterson
                                                      Kilgore & Kilgore, PLLC
                                                      3141 Hood St., Suite 500
                                                      Dallas, Texas 75219


Defendant-Appellee:                       Texas Christian University


Counsel for Defendant-Appellee:     Eva W. Turner
                                                      Eva.turner@ogletree.com
                                                      Molly Ann Lawrence
                                                      mollyann.lawrence@ogletree.com

                                                      8117 Preston Road, Suite 500
                                                      Dallas, Texas 75225


                                                      /s/ W. D. Masterson
                                                      W. D. Masterson

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant Leigh Holland submits that because the legal issues presented with respect to Appellant's appeal claims are significant and the factual issues complex, oral argument is requested.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS ................................................................................... iv

TABLE OF AUTHORITIES ............................................................................. vi

I.      STATEMENT OF JURISDICTION ..................................................... 1

II.     STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................... 2

III.    STATEMENT OF THE CASE ............................................................. 2

        A.      Introduction & Procedural Background ................................. 2

        B.      Background Facts .................................................................. 2

IV.     SUMMARY OF THE ARGUMENT ..................................................... 10

V.      ARGUMENT ..................................................................................... 10

        Issue No. 1: The Trial Court Erred in Granting Appellee's Motion For
                Summary Judgment on Holland's Claims For FMLA
                Interference and Discrimination ............................................... 10
                A. Standard of Review ............................................................. 10
                B. Elements of Appellant's FMLA Interference and
                Discrimination Claims ......................................................... 12

        Issue No. 2: The Trial Court Erred in Granting Appellee's Motion For
                Summary Judgment On Holland's Claims For FMLA
                Retaliation. ........................................................................... 17
                A. Standard of Review ............................................................. 18
                B. Elements of Appellant's FMLA Retaliation Claim ............. 18

        Issue No. 3: The Trial Court Erred in Granting Appellee's Motion For
                Summary Judgment on Holland's Claim of Equitable
                Estoppel ................................................................................ 20

                A. Standard of Review ............................................................. 20
                B. Elements of Appellant's Claim of Equitable Estoppel ........ 20

V.    CONCLUSION.................................................................................22

SIGNATURE PAGE.............................................................................22

CERTIFICATE OF SERVICE ..............................................................23

CERTIFICATE OF COMPLIANCE.......................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Caldwell v. KHOU-TV*,
    850 F.3d 237 (5th Cir. 2017) ...........................................................15

*Campos v. Steves & Sons, Inc.*,
    10 F.4th 515 (5th Cir. 2021) ............................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548 (1986)................................................11

*Davis v. Zahradnick*,
    600 F.2d 458 (4th Cir. 1979) ...........................................................12

*Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*,
    123 F.3d 301 (5th Cir. 1997) ...........................................................11

*Horn v. Squire*,
    81 F.3rd 969, 973 (10th Cir. 1996)...................................................11

*Ladner v. Hancock Medical Center*,
    299 F. App'x 380 (5th Cir. 2008) .....................................................15

*Losch v. Borough of Parkesburg, Pennsylvania*,
    736 F.2d 903 (3rd Cir. 1984) ...........................................................11

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990)..........................................................................11

*Menard v. ITC Deltacom Commc'ns, Inc.*,
    447 F.3d 352 (5th Cir.2006) .............................................................20

*Murray v. Red Kap Indus., Inc.*,
    124 3d 695, 698 (5th Cir. 1997) .......................................................14

**Statutes**

28 U.S.C. §1291 ......................................................................................1

FMLA.................................................................................................*passim*

**Other Authorities**

29 C.F.R § 825.113(b) ...............................................................14

29 C.F.R § 825.115(c)................................................................15

29 C.F.R. § 825.301 ..................................................................17

Fed. R. Civ. P. 56(c)..................................................................11

# I.

## <u>STATEMENT OF JURISDICTION</u>

1.01   The trial court had federal question jurisdiction of the parties to this case.  ROA.19.

1.02   Plaintiff-Appellant filed her Complaint on March 28, 2024. *See*, ROA.9.  On May 23, 2024, Appellee filed Defendant's Answer.  ROA.58.

1.03   Plaintiff-Appellant filed a Motion for Summary Judgment on December 19, 2024.  ROA.193.  Defendant-Appellee filed its Response to Motion for Summary Judgment on January 23, 2025. ROA.650.

1.04   Defendants-Appellees then also filed a Motion for Summary Judgment on January 20, 2025. ROA.438.  Plaintiff-Appellant filed Response to Motion for Summary Judgment on February 11, 2025. ROA.857.  The trial court granted the Defendant-Appellee's Motion for Summary Judgment in a Memorandum Opinion and Order filed April 3, 2025. ROA.1052.  The Final Judgment was entered the same day. ROA.1061.

1.05   Plaintiff-Appellant timely filed a Notice of Appeal on April 28, 2025.  ROA.1094.   This Court has jurisdiction because Holland appeals from a final judgment.  28 U.S.C. §1291.

## II.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**Issue No. 1**:    The Trial Court Erred in Granting Appellee's Motion For Summary Judgment on Holland's Claims For FMLA Interference and Discrimination.

**Issue No. 2**:    The Trial Court Erred in Granting Appellee's Motion for Summary Judgment On Holland's Claims For FMLA Retaliation

**Issue No. 3**:    The Trial Court Erred in Granting Appellee's Motion For Summary Judgment on Holland's Claim of Equitable Estoppel

## III.

## STATEMENT OF THE CASE

### A. Introduction and Procedural Background.

3.01    Plaintiff/Appellant Leigh Holland is appealing from a take nothing dismissal summary judgment granted by the Trial Court on her claims as a 20-year employee against her employer Texas Christian University for interference, discrimination, retaliation and promissory estoppel.

3.02    Holland filed suit on March 28, 2024.  Final judgment was entered on April 3, 2025.

3.03    This appeal was filed on April 28, 2025.

### B.    Background Facts

3.04    The following factual narrative is supported by the Appellant's

Declaration, ROA.237.

3.05    Appellant Holland began her career with Texas Christian University on July 15, 2002, as an Admissions Coordinator to oversee the admissions program along with Microsoft testing (MOUS), hourly at 36 hours per week with a compensation of $28,000 annually. The position was brand new, which was due to the calculation of business students who would apply in the upcoming year. Because there were more than 300 plus students wanting to apply to the business school, TCU implemented an admissions program. Plaintiff's direct supervisor was Randy Lewis who gave Plaintiff the autonomy to run the program without supervision. The duties included, but were not limited to, processing applications, preparing and sending letters, working with alumni to be a part of Interview Day, proctoring the MOUS exams and maintaining the budget.

3.06    As time went on, Plaintiff transitioned into a new role within Student Affairs. Here, Plaintiff served as the Administrative Assistant for the Assistant Vice Chancellor of Student Affairs, Dr. Darron Turner. Dr. Turner's mentorship and guidance became instrumental in Plaintiff's professional growth, and she flourished under his leadership. Dr. Turner was a firm believer in enhancing his employees' skills and abilities, therefore allowing them to participate in training opportunities.

3.07    During Plaintiff's tenure within Student Affairs, she began to take on new challenges and responsibilities while still reporting to Dr. Turner.   Plaintiff

moved from the Administrative Assistant to the Executive Assistant role. This role gave Plaintiff more budget responsibilities and allowed Plaintiff to become more familiar with Board of Director reports, Title IX reports, SACS reports and the creation of policies and procedures of the office. As Dr. Turner's responsibilities increased to working with EEO and Affirmative Action, so did Plaintiff's responsibilities. These responsibilities moved Plaintiff from the job of Executive Assistant to the role of EEO/AA Program Specialist. While there was not a monetary increase outside of a standard 3%, in this role Plaintiff had the opportunity to increase her knowledge in fair processing in hiring practices across the university for faculty and staff.

3.08   In 2011, the federal law produced the Dear Colleague Letter, which caused major changes to federal contractors. Dr. Turner became the Title IX Coordinator in addition to his role as the Assistant Vice Chancellor of Student Affairs. These changes afforded Plaintiff the opportunity to move from the EEO/AA Program Specialist role to the Title IX and Compliance Specialist. Again, Plaintiff did not get a monetary increase, just a title change; but the experience was a great reward. This role came with a plethora of duties, such as prevision of policy, investigation of Title VI and Title VII cases, and training university faculty and staff on Title IX policies and procedures, just to name a few. Plaintiff's commitment to the work and the university never wavered, and she became an indispensable

member of the team despite the lawsuits, demand letters and other issues that came with the positions. Due to the demands of Title IX and the caseload, in 2018 the office moved under the Chancellor's umbrella with a new team, promotion and title changes. These changes consisted of Dr. Turner, Title IX Coordinator and Senior Advisor to the Chancellor, Plaintiff, Leigh Holland Title IX Investigator, Andrea McDew, Deputy Title IX Investigator, Cheryl Taylor, Title IX and Compliance Specialist, Aisha Torrey-Sawyer, Director of Diversity and Inclusion and Sharon Gooding, Coordinator of Diversity and Inclusion.

3.09   In 2020, Dr. Turner and Plaintiff along with several other university members were named in a discrimination lawsuit. Due to the stress of the lawsuit, in August of 2020, Dr. Turner retired, which caused a restructuring of the office, name change, and the appointment of a new director. Under the new name, Office of Institutional Equity (OIE), it inherited Title VI and Title VII from Human Resources while still serving all Title IX cases for Faculty, Staff and Students.

3.10   Under this new structure, Sharon Gooding became the Director of the Office of Institutional Equity. Andrea McDew assumed the role of Title IX Coordinator and became Plaintiff's direct supervisor.  Cheryl Taylor had a dual role of Title IX and compliance Specialist and Investigator to further develop her skills, but over time she could not handle both roles and the Investigator role and title was changed to Civil Rights and Title IX Case Manager. Within OIE, Plaintiff's title was

changed to OIE Investigator with no additional monetary increase. Plaintiff had trained Andrea McDew (Plaintiff's direct supervisor) and Cheryl Taylor (Case manager) on the processes and procedures of the office before the reorganization.

3.11  The cases were minimal before the restructuring of the OIE office. Once the change, they began to see a case increase due to the shifting of Title VI and Title VII complaints to the OIE office. From August 2020 to March 2021, Plaintiff was the only named investigator in the office. Andrea, Sharon and Cheryl would investigate some cases, but by title and job description, Plaintiff was the only one. In mid-April of 2021, a new hire came aboard, Teri Green as an investigator. Until Teri finished training and learning the Title IX regulations, Plaintiff's assigned caseload remained heavy.

3.12  The Jane Doe discrimination case, which Plaintiff investigated and completed in 12/2019, became a lawsuit that Plaintiff was named in. This suit started out with one person and multiplied into 5 Jane Doe's. This suit lingered into 2021. As Plaintiff gathered material, spoke to lawyers, and prepared for possible depositions, Plaintiff continued to work on other complicated cases. (Note, TCU settled this case)

3.13  In July of 2021, an investigation of wrongful termination was on Plaintiff's docket and Plaintiff had to interview high up administrators while maintaining her composure despite wrongful actions, such as harsh emails and phone

calls from the respondents, who were Plaintiff's colleagues at the time. (Note, TCU settled this case also)

3.14   December 2021 another discrimination case landed on Plaintiff's docket. This case was particularly difficult for Plaintiff as an African American woman, considering the historical context of slavery and cotton picking. Plaintiff had to suppress her feelings of discrimination and listen to numerous justifications for the action of Secret Santa gifting a two-foot cotton plant, complete with roots, moss, and dirt, from a Caucasian colleague to an African American colleague. Plaintiff also had to hold several meetings with Human Resource staff, who were Caucasian, to put the respondent on administrative leave in support of the African American woman who worked in the same space as the respondent. This case became a significant strain on Plaintiff's mental health, especially with the traumatic comments and questions from the administration, such as questioning if the gift really caused harm, whether the respondent should only receive a warning, versus termination and the impact of dissemination of work to the African American colleague if the respondent was on leave. These responses felt like attempts to justify the actions of the white colleague, adding to the emotional burden of the situation.

3.15   After the completion of this case in April 2022, Plaintiff had to have surgery on her wrist, which she put off because she was in the middle of this investigation. Plaintiff's surgery and first FMLA leave was in May 2022. While on

FMLA, Plaintiff began to see her therapist to help her with the depression and mental trauma. Plaintiff returned to work in July of 2022.

3.16    August 2022 another case Plaintiff investigated (discrimination based on gender) became a lawsuit. Although Plaintiff was not named in this one, Plaintiff played an intricate part in gathering information and speaking to outside counsel about Plaintiff's investigation process, information Plaintiff collected, and any biases Plaintiff may or may not have. Plaintiff was still going to therapy while trying to maintain her workload of mentally debilitating cases with no form of outlet or detoxing of information. (TCU settled this case as well).

3.17    In December 2022, a former student who used to visit Plaintiff's old office sent a demand letter to the Chancellor of the University and copied Plaintiff. The nature of the email was concerning enough that TCU police stationed an armed officer at the front door of the building to protect the Chancellor. Given Plaintiff's history with this student and Plaintiff's involvement in his discrimination complaint, Plaintiff became worried about her safety. Plaintiff raised her concerns with Sharon Gooding, the Director of OIE, but unfortunately, no action was taken. Plaintiff requested an officer for her end of the building, but the Chancellor's stance was firm: "we do not lock building doors", and no additional officer was assigned. The statement in the letter "May God have mercy on TCU" left Plaintiff traumatized and led Plaintiff to continue therapy sessions for a confidential outlet. Over the

Christmas break, the student vandalized the building, prompting the SWAT team, bomb squad, and local police to arrive and eventually detain him.

3.18    In January 2023 after arriving back from the holiday break, the first case on Plaintiff's docket was a case of sexual assault where the complainant lured the respondent in the basement and threatened to kill him with a hatchet. This case was intense and facilitated multiple reports, interviews, social media documents and Plaintiff's accessibility to the complainant, her witness and the respondent.

3.19    Plaintiff spoke to Sharon Gooding on February 16, 2023, about her mental state and informed Ms. Gooding that she would be seeing her therapist on Friday. She stated, "Do what you need to do for your self-care." Plaintiff expressed the influx of cases and the impossibility to take time off; Gooding again said, "We have to take care of ourselves, and I am here for you if you need anything."

3.20    On Friday, February 17, 2023, Plaintiff met virtually with her therapist and Plaintiff broke down in her session. He advised Plaintiff to take the rest of the day off and provided Plaintiff with a doctor's note to give to her supervisor. Andrea McDew was still on maternity leave so Plaintiff slid the note under Sharon Gooding's door and left for the day.

3.21    On February 20, 2023, Plaintiff met with her therapist again and he advised Plaintiff to take some extended time off to get her mental health under control.

3.22   On February 17, 2023, Plaintiff was officially on FMLA through May 2, 2023. ROA.242.  Upon Plaintiff's return she was directed by Joan Fralia (Yohana Chambers assistant), to meet in Human Resources at 9am. When Plaintiff got there, she became aware that this meeting was a separation meeting. At the time of Plaintiff's termination her compensation was $82,751 annually.

## IV.

## SUMMARY OF THE ARGUMENT

4.01   The Trial Court erred by granting summary judgment to Appellee. Indeed, Holland should have been granted summary judgment on her interference, discrimination, retaliation and equitable estoppel claims. As shown hereafter the Trial Court made materially erroneous findings of fact and conclusions of law to support its judgment.

## V.

## ARGUMENT

**Issue No. 1:**    **The Trial Court Erred in Granting Appellee's Motion For Summary Judgment  on Holland's FMLA Interference and Discrimination Claims.**

**1.    Standard of Review.**

5.01   Because examination of these issues involves an appeal from the

District Court's grant of summary judgment, the Fifth Circuit reviews these issues *de novo*. *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 304-05 (5th Cir. 1997).

5.02   The standard for entry of summary judgment is well settled law. Summary judgment is proper in a case only where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2552 (1986).  A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.  Defendant, as movant, cannot rely on conclusory statements to establish that plaintiff has not presented evidence on an essential element. Rather, defendant must demonstrate an absence of a genuine factual dispute. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.  Only if defendant meets its burden is the plaintiff required to respond by summary judgment proof to show a genuine issue of material fact.

5.03   To determine whether there is a genuine issue of material fact, the Court must consider the summary judgment proof in the light most favorable to plaintiff as the non-movant. *Horn v. Squire*, 81 F.3rd 969, 973 (10th Cir. 1996). All reasonable doubts must be resolved against the moving party. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Conflicts of credibility should not be resolved by motion for summary judgment.  *Losch v. Borough of Parkesburg,*

*Pennsylvania*, 736 F.2d 903 (3rd Cir. 1984); *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979)

> **B.    Elements of Appellant's FMLA Inference and Discrimination Claims.**

> **1.  Holland's Mental Health History-A Summary From Holland's Declaration (ROA.237)**

5.04   TCU interfered with Holland's FMLA leave and her right to resume employment upon returning to work as provided by the FMLA, and discriminated against her by firing her on the day she returned to work after taking FMLA leave.

5.05   As noted *supra*, in 2018, after 16 years of employment, as a result of the demands of the caseload Holland was given the title of Title IX Investigator.  In 2020 Dr. Turner and Holland were both named as defendants in a discrimination lawsuit against Appellee TCU.  As a result of the stress Dr. Turner retired, Holland's title was changed to OIE Investigator, and Holland's caseload increased significantly.

5.06   In December 2021 an especially difficult discrimination case for Holland was presented including serious claims of discrimination by an African American woman.  Holland's impartiality in the case involving a two foot high cotton plant with all its racial overtones was questioned.  After the case was resolved Holland began to see her therapist in May 2022 to help with her depression and mental trauma.

5.07   In August 2022 another stressful discrimination case followed while Holland was still undergoing therapy.  In December 2022 yet another situation arose which called Holland's personal and workplace safety into question.  Holland's request for additional police protection was denied.

5.08   As a result of the workplace trauma Holland suffered a series of uncontrollable weeping and crying spells. ROA.478.  Holland was having trouble coping with all the job stress and trauma.

5.09   By the time Holland consulted with Dr. Chism in February 2023, she already had a multi-year chronic history of increasing job stress and therapist consultations.

5.10   Although TCU has referred to Holland's treatment by her therapist Dr. Moses Chism as only an attempt "to teach her positive life skills," in fact Dr. Chism gave a much more descriptive and informative diagnosis at ROA.584. as follows:

| Q (Def's Counsel) | Okay.  Got it.  And then "she is burned the hell out."  Is there anything specific that you were referring to there? |
| --- | --- |
| A (Dr. Chism) | She's declining in her symptoms.  She's operating on fumes and she's not-she's not healthy. |

5.11   Due to Holland's declining condition her supervisor Sharon Gooding encouraged Holland to take FMLA leave.

- In ROA.829, a February 21, 2023 email to Holland, Gooding wrote:

"No inconvenience here-take care of yourself."

- In ROA.827, a second February 21, 2023 email to Holland, Gooding

  wrote: "I wish you well as you navigate this time in your life."

## 2. **The Trial Court Erroneously Applied the "Serious Health Condition" Standard to the Facts of this Case.**

### 1. The Trial Court's Narrow Interpretation of "Incapacity" Conflicts with FMLA Regulations.

5.12   The Trial Court incorrectly narrowed the definition of "incapacity" under the FMLA, effectively requiring complete inability to work rather than applying the broader regulatory definition.  While the Trial Court cited *Murray v. Red Kap Indus., Inc.,* 124 3d 695, 698 (5th Cir. 1997) for the proposition that incapacity means "the inability to work," this interpretation fails to account for the full regulatory definition in 29 C.F.R § 825.113(b), which defines incapacity as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom".

5.13   Here Dr. Chism's professional determination that Holland needed time off for mental health evaluation and that she was "operating on fumes" and was "not healthy" constitutes sufficient evidence of a mental health condition requiring treatment. Dr. Chism diagnosed Holland as suffering from depression. ROA.683.

5.14   The Trial Court's analysis focuses narrowly on "incapacity" without adequately addressing whether Holland's condition could qualify as a "chronic

serious health condition" under 29 C.F.R § 825.115(c). Under FMLA regulations, a chronic serious health condition is one that:

1.    Requires periodic visits for treatment;

2.    Continues over an extended period; and

3.    May cause episodic rather than continuing incapacity.

5.15   In *Ladner v. Hancock Medical Center*, 299 F. App'x 380 (5th Cir. 2008), the Fifth Circuit held in a *per curiam* opinion that a jury finding in favor of the plaintiff based on a correct definition of "serious health condition" would be sustained despite the trial court's refusal to instruct the jury on the definition of "incapacity."

5.16   The facts in *Ladner* were that the plaintiff had taken FMLA leave to care for her son who had a chronic condition of asthma. Thus, this case of chronic depression (ROA.241) as a result of workplace trauma should be submitted to a jury for a fact determination of whether a "serious health condition" is present in this case.

## 2.  The Trial Court Improperly Required Complete Inability to Work

5.17   The Trial Court erroneously equated Holland's statement that she could perform her job functions with a conclusion that she did not have a serious health condition. This app829ch contradicts the Fifth Circuit's decision in *Caldwell v. KHOU-TV*, 850 F.3d 237 (5th Cir. 2017), where the court determined that an

employee's ability to perform some work functions does not automatically disqualify the employee from FMLA protection if their condition substantially limits their ability to perform the full range of their duties.

### 3.  TCU Interfered by Requiring Holland To Work During Leave

5.18   As soon as Holland took FMLA leave Ms. Gooding, Holland's supervisor, began sending Holland emails requiring Holland to engage in work during her FMLA leave.   See ROA.224-5.   These emails clearly constituted interference with Holland's FMLA leave.

5.19   Nevertheless, Holland fully responded to the emails as noted on the emails.

### 4.  Plaintiff Was Entitled to Rely on Unum's Grant of Leave Under the FMLA Statute.

5.20   Defendant used Unum as the Administrator for its FMLA leaves. Unum reviewed all forms required for Plaintiff's FMLA leave and granted Plaintiff leave from February 17, 2023, to May 1, 2024.  ROA.216.  Unum received medical documentation from Dr. Chism and approved Holland's FMLA leave.  ROA.216-217. Furthermore, Defendant subpoenaed Holland's records from Unum.  Despite this TCU has rejected the leave without pointing out any error in the Unum paperwork.  Unum acted as TCU's agent and any complaint as to qualification for the FMLA leave should be addressed to Unum, not Holland.  Unum was TCU's

agent, and TCU is responsible as principal for Unum's decisions regarding FMLA leave, including the decision that Holland qualified for FMLA leave.

5.21   Unum had administered Holland's FMLA leave in May of 2022, without incident (ROA.241), so Holland had no reason to question Unum's grant of FMLA leave in 2023, only a year later.

5.22   Employees should not have to retain legal counsel to verify the decisions by an employer's FMLA administrator in order to receive their legally protected FMLA benefits.  Department of Labor Regulation 29 C.F.R. § 825.301 <u>Designation of FMLA Leave</u> provides as follows in subsection (a) entitled Employer Responsibilities:

> In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying.

TCU never inquired further of Holland but now seeks to raise an issue about Holland's use of leave.

5.23   If there had been a dispute between TCU and Holland over her qualification for leave subsection (c) provides that it would have been resolved through discussions between the employee and the employer which "must be documented."  There was no such dispute, so there is no documentation.

**ISSUE NO. 2:     The Trial Court Erred in Granting Appellee's Motion for Summary Judgment on Holland's Claim for FMLA Retaliation.**

**A. Standard of Review.**

5.24   See Issue No. 1 *supra*.

**B. Elements of Appellant's FMLA Retaliation Claim.**

5.25   Holland was fired by TCU on May 2, 2023, the day she returned to work from her FMLA leave.  ROA.242.  When an employee is fired on the very day the employee returns from FMLA leave or even shortly thereafter, the Court can conclude that the temporal proximity of the firing and the termination can serve as evidence that the firing was caused by taking the FMLA leave. The reasoning of the Fifth Circuit is set forth in the following excerpt from *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 528 (5th Cir. 2021):

> The district court concluded that the prima facie case was satisfied. Campos qualified for FMLA leave, which Steves & Sons admitted by putting Campos on *528 FMLA leave during his hospitalization; Campos suffered an adverse employment action when the company terminated his employment on November 30; and there is the degree of temporal proximity that has been found to support a causal connection for purposes of a prima facie case. Here, the adverse employment action occurred approximately one month after Campos's FMLA leave expired, and we conclude that a month is close enough in time to create a causal connection. See *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that temporal connection must be "very close"); see also *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (allowing two-and-a-half months to establish causation in a Title VII retaliation claim, a conclusion with which we agree). Thus, the burden shifts to Steves & Sons to offer legitimate, nonretaliatory reasons for the adverse action.

5.26   The temporal proximity of Holland's firing and her termination shifts

the evidentiary burden to TCU.  TCU has argued that the reason for Holland's firing was that Holland was guilty of "dissatisfactory work performance." ROA.890, ROA.597.    No argument was made that Holland was not qualified to take FMLA leave.

5.27    This alleged work performance reason was clearly pretextual because it is based solely on a draft defamatory and malicious evaluation of Holland (ROA.890) which was prepared on April 27, 2023, by Holland's supervisor Sharon Gooding, who had encouraged Holland to take FMLA leave, only 4 days prior to Holland's return to work and termination, with no previous supporting documentation of unsatisfactory job performance. Holland never received a "written warning" from Ms. Gooding or a Performance Improvement Plan ("PIP")  as stated in paragraph 19 of ROA.852.   Holland never saw the draft performance evaluation nor heard the charges until the draft was produced in discovery in this case.  The draft contains extensive hearsay and unsubstantiated charges, raising numerous questions of fact which only a jury should determine.  The cited draft (ROA.890) also contains Holland's written responses to the charges after each charge in red.  In an attempt to corroborate the contents of the April 27 draft, Defendant subpoenaed Holland's complete employment records from the other employers from 1998 to 2023.   However, these records revealed only excellent performant evaluations throughout Holland's tenure and contained no written PIP plans or prior disciplinary

documentation.

5.28   The pretextual nature of the reason for Holland's firing is further evidenced by the fact that the Declaration of Yohna Chambers-Hastings, Vice Chancellor and Chief Human Resources  Officer of TCU, ROA.846, recites that despite Gooding's charges, Holland was offered a monetary separation package and could have continued employment at TCU for a month, ending June 2, 2023, at which time Holland would retire, rather than being fired for cause as alleged by Gooding.

**Issue No. 3:**   **The Trial Court Erred in Granting Appellee's Motion for Summary Judgment on Holland's Claim of Equitable Estoppel.**

### A. Standard of Review.

See Issue No. 1 *supra*.

### B. Elements of Appellant's Claim of Equitable Estoppel.

5.29   The Trial Court recognized the applicability of the doctrine of equitable estoppel to the facts of this case based upon the holding in *Menard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352 (5th Cir.2006).  However, the Trial Court held that the doctrine of equitable estoppel did not apply because Holland "explicitly disclaimed detrimental reliance." ROA.1059.  The support the Trial Court cites for its conclusion that Holland had disclaimed detrimental reliance was that Holland had stated that she had available and would have if necessary used ample accrued vacation and personal time off to take a leave with pay instead

of FMLA leave if FMLA leave had not been granted. However, this certainly does not mean that she would not have been prejudiced had she done so because she received UNUM disability pay for the FMLA leave time off while she would have had to use her earned PTO and vacation time credits to pay for the time otherwise required to recover from the litigation stress effects of her then current cases. After Holland was terminated she was paid for her unused PTO time.

5.30    But in addition, the biggest detriment she would have avoided was the loss of her job! Gooding had never confronted Holland with any of her job ending complaints directly so there is no reason she would have done so except for the fact that Holland's return to work required an FMLA return to work meeting instead of a simple return to work from PTO leave or vacation. There is no reason to believe that Holland would have lost her $82,000/year job that she had invested 20 years of faithful service in had she not taken FMLA leave. This was a catastrophic detriment suffered by Holland. Therefore, the Court should find that TCU is equitably estopped to claim that Holland's FMLA leave was not properly granted in this case.

## VI.

## <u>CONCLUSION</u>

WHEREFORE, PREMISES CONSIDERED, Appellant Leigh Holland prays the Court to reverse the trial court's summary judgment dismissal, direct the Trial Court to proceed with jury trial and grant Appellant Leigh Holland such other and further relief as shall be proper.

Dated: June 16, 2025.

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By:     */s/ W. D. Masterson*
        W.D. Masterson
        SBN: 13184000
        wdm@kilgorelaw.com
        3141 Hood Street, Suite 500
        Dallas, Texas 75219
        (214) 969-9099 - Telephone
        (214) 953-0133 - Facsimile

        **ATTORNEYS FOR APPELLANT,
        LEIGH HOLLAND**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on June 16, 2025, a true and correct copy of the foregoing document was filed with the ECF system, so that an electronic copy of the document was automatically transmitted to counsel for the opposing party.

**<u>Via ECF:</u>**

Eva W. Turner
eva.turner@ogletree.com
Molly Ann Lawrence
mollyann.lawrence@ogletree.com

8117 Preston Road, Suite 500
Dallas, TX 75225


*/s/ W. D. Masterson*
W. D. Masterson

## <u>CERTIFICATE OF COMPLIANCE</u>

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH Cir. R. 32.2, THE BRIEF CONTAINS (select one):

   A. 5,446 words, OR

   B. N/A lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED (select one):

   A. in proportionally spaced typeface using:

   Software Name and Version: Microsoft Word 365

   in (Typeface Name and Font Size): Times New Roman - 14, OR

   B. in monospaced (nonproportionally spaced) typeface using:

   Typeface name and number of characters per inch:

   N/A

3. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN Fed. R. App. P. IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

   */s/ W. D. Masterson*
   W. D. Masterson